593 S.E.2d 629

Nada D. (Stanley) SHAFFER,
Plaintiff Below, Appellee,

v.

Wetzel Gary STANLEY, Defendant
Below, Appellee,

and

State of West Virginia Department of
Health and Human Resources, Bureau
for Child Support Enforcement, Appel-
lant.

No. 31118.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 9, 2003.

Decided Nov. 26, 2003.

Dissenting Opinion of Justice
Davis Dec. 4, 2003.

Davis, J., filed opinion dissenting in part.

David L. Hill, Esq., Hamlin, West Virginia, Attorney for W.G. Stanley.

Kimberly D. Bentley, Esq., Assistant General Counsel, West Virginia Department of Health and Human Resources, Bureau for Child Support Enforcement, Charleston, West Virginia, Attorney for WV DHHR, BCSE.

Bruce G. Perrone, Esq., Legal Aid of West Virginia, Attorney for Amicus Curiae, Nada Stanley.

MAYNARD, Justice:

The appellant, the Bureau for Child Support Enforcement ("BCSE"), appeals the April 27, 2001, order of the Circuit Court of Lincoln County that holds the BCSE and Nada Stanley jointly and severally liable to pay to the appellee, Wetzel Garry Stanley, $19,837.96, which the court determined to be an overpayment of child support paid by Mr. Stanley.

## I.

## FACTS

The essential facts of this case gleaned from the record and the pleadings of the parties are as follows. The appellee, Wetzel Garry Stanley ("Mr.Stanley"), and Nada D. Stanley[1] were divorced in 1978. Nada Stanley was granted custody of the couple's two children, and Mr. Stanley was ordered to pay $200 per month child support.[2]

By order of August 1, 1980, Nada Stanley was granted judgment against Mr. Stanley in the amount of $1000 for unpaid child support. On or about June 16, 1981, a writ of execution and suggestion were filed in an attempt to execute the judgment award.

In 1982, the appellant, the Bureau for Child Support Enforcement ("BCSE"), intercepted the income tax refund of Mr. Stanley for tax year 1981 for unpaid child support. According to Mr. Stanley's counsel during oral argument before this Court, for the next several years Mr. Stanley "did what he could" to meet his child support obligation and occasionally made cash payments directly to Ms. Stanley. He admitted, however, that the total amount paid was "minimal." During this time, no official action was taken by the BCSE or Ms. Stanley to enforce Mr. Stanley's child support obligation, although Mr. Stanley apparently received regular billing statements and letters from the BCSE in an effort to collect child support. According to the BCSE, for the tax years 1989 through 1997, it regularly attempted unsuccessfully to intercept Mr. Stanley's income tax refunds.

In October 1993, Ms. Stanley filed a petition for contempt against Mr. Stanley for his

1. Although Ms. Stanley's name appears in the style of this case as Nada D. (Stanley) Shaffer, she explains in her amicus curiae brief that after her divorce from Mr. Stanley, she married a man named Shaffer. However, she subsequently divorced Mr. Shaffer and once again took the name of Stanley.

2. This support obligation ceased in March 1994 by operation of law.

failure to pay child support. Later that month, the BCSE issued a "Notice To Source Of Income To Initiate Withholding" to the Social Security Administration to withhold specified amounts to meet Mr. Stanley's child support obligations. In December 1993, Mr. Stanley received a Social Security disability backpay award of about $20,000, from which there was no withholding.[3] Also in December 1993, Mr. Stanley filed a petition for determination of arrears. Although a hearing was held before a family law master[4] on the parties' petitions, no order was entered as a result of the hearing.

On March 11, 1997, the BCSE issued to the Workers' Compensation Division a "Notice To Employer/Source Of Income To Initiate Withholding." As a result, in March 1997, the BCSE intercepted $32,796.60 from a Workers' Compensation lump sum award to Mr. Stanley for the payment of child support arrearage. This money was then forwarded to Nada Stanley.

In October 1997, Mr. Stanley filed a petition for modification of child support in which he requested that the BCSE withholdings from his monthly Social Security check be terminated. After a hearing in February 1998, the family law master entered an April 9, 1998, order in which she rejected Mr. Stanley's claim that the statute of limitations barred collection of a portion of the arrearage.[5] She also gave Mr. Stanley a credit toward the arrearage for Social Security benefits paid directly to Nada Stanley on behalf of the couple's children in the amounts of $96 per month from February 1994 through November 1994; $98 per month from December 1994 through May 1995; and a lump sum payment of $2,745.90 in 1993. In addition, the family law master awarded to the BCSE a decretal judgment against Mr. Stanley in the amount of $2,896.76, as reimbursement of welfare benefits formerly paid to Nada Stanley. Finally, the family law master ordered

that income withholding from Mr. Stanley's monthly social security check be limited to $300. This recommended order was erroneously entered on April 9, 1998, absent the opportunity afforded by the ten-day period in which to file exceptions to a recommended order of a family law master. Accordingly, by orders of November 23, 1998 and January 22, 1999, the circuit court set aside the order, and regarded it as a valid family law master's order to which exceptions could be filed within ten days.

Mr. Stanley filed exceptions to the family law master's recommended order based on its failure to apply the ten-year statute of limitations for the execution of judgments in W.Va.Code § 38–3–18. Subsequently, the circuit court held that Nada Stanley and the BCSE failed to pursue collection of child support between the writ of execution filed in 1981 and the contempt petition filed in 1993. Therefore, the ten-year statute of limitations barred collection of child support owed prior to October 1, 1983 which was ten years prior to Nada Stanley's contempt petition. Accordingly, the circuit court ordered the BCSE to recalculate the child support arrearage owed by Mr. Stanley.

Following the recalculation, the circuit court granted judgment to Mr. Stanley against Nada Stanley for an overpayment of child support in the amount of $17,855.49, plus interest. The BCSE was ordered to return any held monies to Mr. Stanley and cease collection activity.

Mr. Stanley subsequently filed a motion to clarify the circuit court's order requesting that the BCSE, in addition to Nada Stanley, also be held responsible for refunding the overpayment. The circuit court found the BCSE jointly and severally liable for the repayment because it breached its duty to forward the withholdings to the proper party.

It is now known that Nada Stanley received a discharge in bankruptcy of all debts

---

3. According to the BCSE, one of Mr. Stanley's children received a social security dependent benefits backpay award of $3078.00 and ongoing monthly payments of $96.00.

4. The family law master system ceased to operate on January 1, 2002, and was replaced by a system of family court judges. *See* W.Va.Code

§ 51–2A–23 (2001). The proceedings in this case occurred under the family law master system.

5. The family law master found that Mr. Stanley's "unclean hands," the 1980 judgment, the 1981 suggestion, and the income tax intercepts tolled the statute of limitations.

and claims, including the claim asserted by Mr. Stanley for child support overpayment. Accordingly, the BCSE is now solely responsible to Mr. Stanley for the overpayment of his child support obligations pursuant to the circuit court's order.[6]

## II.

## STANDARD OF REVIEW

In considering the circuit court's order now challenged by the BCSE, we are guided by our oft-stated rule that "[t]his Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo.*" Syllabus Point 4, *Burgess v. Porterfield*, 196 W.Va. 178, 469 S.E.2d 114 (1996).

## III.

## DISCUSSION

### A. Applicability of the Ten-Year Limitation Period

The first issue before this Court is whether the circuit court erred in its application of the time limitation for execution of judgments found in W.Va.Code § 38–3–18 (1923), which states:

On a judgment, execution may be issued within ten years after the date thereof. Where execution issues within ten years as aforesaid, other executions may be issued on such judgment within ten years from the return day of the last execution issued thereon, on which there is no return by an officer or which has been returned unsatisfied. An action, suit or scire facias may be brought upon a judgment where there has been a change of parties by death or otherwise at any time within ten years next after the date of the judgment; or within ten years from the return day of the last execution issued thereon on which there is no return by an officer or which has been returned unsatisfied. But if such action, suit or scire facias be against the personal

representative of a decedent, it shall be brought within five years from the qualification of such representative.

The circuit court found,

that there is no exception to the 10–year statute of limitations set forth in *West Virginia Code* Section ... 38–3–18. In *Zanke v. Zanke*, 185 W.Va. 1, 404 S.E.2d 92 (1991), the Court reaffirmed this principal [sic]. Accordingly, it is ORDERED and ADJUDGED that ... the plaintiff and the State of West Virginia are barred by the statute of limitations from collecting any past due child support which was payable prior to October, 1983, including the 1980 judgment. The Child Support Enforcement Division shall recompute the defendant's arrearage beginning with a zero balance due on October 1, 1983[.]

Initially, we conclude that the manner in which the circuit court applied the time limitation in W.Va.Code § 38–3–18 is correct. There is no dispute that the limitation period in W.Va.Code § 38–3–18 applies to the collection of child support judgments. According to Syllabus Point 6 of *Robinson v. McKinney*, 189 W.Va. 459, 432 S.E.2d 543 (1993), "[t]he ten-year statute of limitations set forth in *W.Va.Code*, 38–3–18 [1923] and not the doctrine of laches applies when enforcing a decretal judgment which orders the payment of monthly sums for alimony or child support." In addition, it is well established that when a provision for periodic payments of child support is made in a divorce decree, these installments become decretal judgments as they become due. *See* Syllabus Point 1 of *Goff v. Goff*, 177 W.Va. 742, 356 S.E.2d 496 (1987) (holding that "[m]atured installments provided for in a decree, which orders the payment of monthly sums for alimony or child support, stand as 'decretal judgments' against the party charged with the payments."). Finally, "[t]he limitation provided in Code, 38–3–18, applied to a decretal judgment payable in installments, commences to run when each installment becomes due, as to the part of said judgment then payable." Syllabus Point 3,

---

6. Although Nada Stanley is protected from liability as a result of the bankruptcy discharge, she

filed an amicus curiae brief with this Court on behalf of the BCSE.

*Korczyk v. Solonka,* 130 W.Va. 211, 42 S.E.2d 814 (1947).

Applying these rules to the instant facts, because Nada Stanley filed her Petition for Contempt of Court in October 1993, and more than ten years had passed since she last attempted through court action to collect child support arrearages from Mr. Stanley, the amount collectable under W.Va.Code § 38–3–18 is that portion of the arrearages that accrued during the previous ten years. *See Zanke v. Zanke,* 185 W.Va. 1, 4, 404 S.E.2d 92, 95 (1991) (per curiam) (where on May 24, 1988, wife filed petition for contempt order and for judgment for arrearage which had accrued since May 20, 1976, divorce order, Court explained that under W.Va.Code § 38–3–18, "[a] proper calculation would be to take the date upon which suit was filed, May 24, 1988, and compute the alimony accrued during the previous ten years."

■ However, the BCSE raises several challenges to the application of the ten-year limitation period under the facts of this case. First, the BCSE avers that its attempts, beginning in 1989, to intercept Mr. Stanley's income tax refunds for the purpose of satisfying his past due child support obligations tolled the ten-year limitation period. In other words, the BCSE says, in effect, that the income tax intercepts constituted "executions" under W.Va.Code § 38–3–18, which served to toll the ten-year limitation period.

■ This issue is a matter of straightforward statutory interpretation. We have previously held that "[a] statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect." Syllabus Point 2, *State v. Epperly,* 135 W.Va. 877, 65 S.E.2d 488 (1951). In addition, "[i]n the absence of any specific indication to the contrary, words used in a statute will be given their common, ordinary and accepted meaning." Syllabus Point 1, *Tug Valley Recovery Center, Inc. v. Mingo Cty. Comm.,* 164 W.Va. 94, 261 S.E.2d 165 (1979). We conclude that the word "execution" in W.Va.Code § 38–3–18 is unambiguous, and that its common, ordinary and accepted meaning does not include income tax intercepts.

An execution upon a money judgment is defined as:

3. Judicial enforcement of a money judgment, usu. by seizing and selling the judgment debtor's property . . . .

4. A court order directing a sheriff or other officer to enforce a judgment, usu. by seizing and selling the judgment debtor's property. . . .

Black's Law Dictionary 589–90 (7th ed.1999). It has also been defined as "[a] process of the court. Specifically . . . a judicial writ issuing from the court where the judgment is rendered, directed to an officer thereof, and running against the body or goods of a party, by which the judgment of the court is enforced." 33 C.J.S. *Executions* § 2 (1998) (footnotes omitted). In West Virginia, the subject of executions is covered by statute. *See* W.Va.Code § 38–4–1, *et seq.*[7] Executions for the specific purpose of collecting matured, unpaid child support are provided for in W.Va.Code § 48–14–201 (2001)[8] which states:

---

**7.** Rule 69 of the West Virginia Rules of Civil Procedure also addresses the subject of executions. According to Rule 69(a) concerning executions for the payment of money:

Process to enforce a judgment for the payment of money shall be a writ of execution, a writ of suggestee execution and such other writs as are provided by law. The procedure on execution and other such final process, in proceedings supplementary to and in aid of a judgment, and in proceedings on and in aid of execution or such other final process shall be in accordance with the practice and procedure prescribed by the laws of the State existing at the time the remedy is sought, subject to the following qualifications: (1) A writ of execu-

tion shall be made returnable not less than 30 days nor more than 90 days after issuance, as directed by the person procuring issuance of the writ; and (2) an answer to a summons issued in a suggestion proceeding shall be served upon the plaintiff within 20 days after service of the summons; and (3) a return on a writ of suggestee execution shall be made forthwith on the expiration of one year after issuance of the writ.

**8.** The former version of W.Va.Code § 48–14–201 which would have been available to Nada Stanley and the BCSE to toll the running of the ten-year limitation period after the issuance of the 1981 writ of execution was W.Va.Code § 48A–5–2.

When an obligor is in arrears in the payment of support which is required to be paid by the terms of an order for support of a child, an obligee or the bureau for child support enforcement may file an abstract of the order giving rise to the support obligation and an "affidavit of accrued support," setting forth the particulars of such arrearage and requesting a writ of execution, suggestion [9] or suggestee execution.[10] The filing of the abstract and affidavit shall give rise, by operation of law, to a lien against personal property of an obligor who resides within this state or who owns property within this state for overdue support. (Footnotes added.).

"Upon receipt of the affidavit, the clerk shall issue a writ of execution, suggestion or suggestee execution[.]" W.Va.Code § 48–14–204(a) (Supp.2001). We conclude, therefore, that an execution necessarily involves a court process wherein a judicial writ is issued.

Concerning the obtainment of past due child support from federal tax refunds, also known as tax intercepts or tax offsets, W.Va. Code § 48–18–117 (2001) provides:

The [West Virginia Support Enforcement] commission shall, by legislative rule promulgated pursuant to chapter twenty-nine-a [§§ 29A–1–1 et seq.] of this code, place in effect procedures necessary for the bureau for child support enforcement to obtain payment of past due support from federal tax refunds from overpayments made to the secretary of the treasury of the United States. The bureau for child support enforcement shall take all steps necessary to implement and utilize such procedures.

Similarly, W.Va.Code § 48–18–118 (2001) provides that the State Tax Commissioner shall establish procedures for the Bureau for Child Support Enforcement to obtain payment of past due child support from state tax refunds wherein the Bureau may enforce a support order through a notice to the Commissioner which causes any refund of state income tax owed to the obligor to be reduced by the amount of overdue support owed by the obligor.[11]

A comparison of the traditional definition of and procedure for the execution of a judgment with the provisions for tax offsets indicates to this Court that a tax offset is not an execution in that it does not involve a process of the court that results in the issuance of a judicial writ. Rather, a tax offset is a purely administrative action initiated and · carried out by executive agencies. Further, this Court does not find dispositive the cases cited by the BCSE for the proposition that actions other than executions may toll the limitation period in W.Va.Code § 38–3–18 because these cases are completely devoid of any analysis or citation of authority to support such a proposition. *See Robinson v. McKinney*, 189 W.Va. 459, 463, 432 S.E.2d 543, 547 (1993) (concluding that "the mother

9. Under W.Va.Code § 38–5–10 (1995), a judgment creditor may commence garnishment proceedings by filing a writ of suggestion against a third party when the judgment creditor alleges that:

a person is indebted or liable to the judgment debtor or has in the person's possession or control personal property belonging to the judgment debtor, which debt or liability could be enforced, when due, or which property could be recovered, when it became returnable, by the judgment debtor in a court of law, and which debt or liability or property is subject to the judgment creditor's writ of fieri facias[.]

In Syllabus Point 1 of *Sauls v. Howell*, 172 W.Va. 528, 309 S.E.2d 26 (1983), this Court held:

Matured, unpaid installments provided for in a decree of divorce, which decree ordered a husband to pay to his former wife $2,700, "in lieu of alimony" at $150 per month, stand as decretal judgments against the husband, and

the wife is entitled to institute suggestion proceedings under *W.Va.Code*, 38–5–10 [1931], to recover upon those judgments, and she need not institute ancillary proceedings to reduce the amount of those judgments to a sum certain.

10. According to W.Va.Code § 38–5A–1(2) (1939), "[t]he term 'suggestee execution' shall mean an execution differing from an ordinary execution upon a judgment only in that it is directed against money due or to become due to the judgment debtor from the suggestee as therein set out."

11. The code sections in effect at the time the BCSE began its attempted tax offsets were W.Va. Code § 48A–2–15 (1986), concerning the obtainment of child support from federal tax refunds, and W.Va.Code § 48A–2–16 (1986), concerning the obtainment of support from State income tax refunds.

is not barred by the statute of limitations from collecting child support from September of 1982 until May of 1989 ... since the mother began the collection process in early 1992 by a Notice to Employer/Source of Income dated February 18, 1992 and by a motion to establish arrearages dated March 12, 1992."); *Clay v. Clay*, 206 W.Va. 564, 568, 526 S.E.2d 530, 534 (1999) (stating that "the appellee began the collection process on August 27, 1998, by filing an Order/Notice to Withhold Income for Child Support[,]" therefore "the appellee may not collect child support for the time period prior to August 27, 1988."); and *State ex rel. DHHR Schwab v. Schwab*, 206 W.Va. 551, 554, 526 S.E.2d 327, 330 (1999) (finding that "[t]he motion to enforce the accrued child support payments was filed in February 1998[,]" therefore, "the appellees may only enforce support payments due after February 1988.").

Accordingly, we hold that the procedure utilized by the Bureau for Child Support Enforcement to obtain payment of past due child support from Federal and State tax refunds from overpayments made to the Secretary of the Treasury of the United States or the State Tax Commissioner, as provided in W.Va.Code § 48–18–117 (2001) and W.Va. Code § 48–18–118 (2001), does not constitute an execution of a judgment under W.Va.Code § 38–3–18 (1923) for the purpose of tolling the ten-year limitation period for the issuance of an execution on a judgment.[12]

■ The BCSE argues, however, that it was improper for the circuit court to apply the statute of limitations retroactively to arrears that had already been collected. According to the BCSE, the time limitation may apply only to *unpaid* debts on which no collection efforts have been taken in ten years. Otherwise, claims the BCSE, the circuit court lacks authority to retroactively modify an arrearage calculation. We do not believe that this argument withstands close scrutiny.

As noted above, the BCSE received $32,796.60 from Mr. Stanley's Workers' Compensation award by means of income withholding pursuant to W.Va.Code §§ 48–14–401 *et seq.* While such withholding requires notice to the obligor advising him, *inter alia*, of his right to challenge the amount of the withholding, significantly, income withholding is not stayed while the withholding is being contested in the court system. *See* W.Va. Code § 48–14–405(12) (Supp.2001) ("That while the withholding is being contested through the court, the income withholding may not be stayed, but may be modified."). If this Court were to accept the BCSE's position that the ten-year limitation period applies only to *uncollected* or *unpaid* arrearages, an obligor's statute of limitation defense to the withholding of income would always fail due to the fact that the arrearages at issue had already been collected by the time the challenge to the withholding is resolved. In short, the ten-year statute of limitation would be rendered void in cases in which the BCSE utilizes income withholding to collect child support arrearages. Accordingly, we reject the BCSE's argument on this issue.

■ The BCSE next contends that Mr. Stanley did not timely raise the affirmative defense of the statute of limitations, and cites *Dept. of Health v. Robert Morris N.*, 195 W.Va. 759, 466 S.E.2d 827 (1995), and Rule 8 of the West Virginia Rules of Civil Procedure for the proposition that the statute of limitations defense should have been included in a written pleading filed by Mr. Stanley. According to the BCSE, although it intercepted the $32,796.60 on or about March 29, 1997, Mr. Stanley did not raise the statute of limitation issue until he did so orally at a February 5, 1998, hearing. Specifically, the BCSE opines in its brief to this Court that,

the only proper and timely assertion of this [time limitation] defense would have been made PRIOR to the interception of the Workers' Compensation proceeds. Garry

12. In the instant case, the circuit court ruled that Nada Stanley was limited to arrearages for ten years prior to Nada Stanley's filing of a contempt petition, not an issuance of an execution. We need not decide at this time whether the filing of a contempt action constitutes an execution for purposes of the limitation period in W.Va.Code § 38–3–18 because Mr. Stanley did not challenge the circuit court's ruling that Nada Stanley could receive arrearages for ten years prior to the date of the contempt action.

Stanley was sent a copy of the income withholding order sent to Workers' Compensation requesting the interception of said proceeds. The income withholding order included provisions for protest if Garry Stanley so desired. Garry Stanley filed no protest to the income withholding order. Therefore, Garry Stanley neglected to assert the affirmative defense in a timely manner.

The BCSE concludes that the doctrine of laches should apply to Mr. Stanley's failure to affirmatively assert the time limitation defense prior to the interception of the funds. We disagree.

This Court has held that "[l]aches is a delay in the assertion of a known right which works to the disadvantage of another, or such delay as will warrant the presumption that the party has waived his right." Syllabus Point 2, *Bank of Marlinton v. McLaughlin*, 123 W.Va. 608, 17 S.E.2d 213 (1941). We do not believe that any delay of Mr. Stanley's assertion of the ten-year statute of limitation worked disadvantage to the BCSE or warranted the presumption that Mr. Stanley waived his right. According to the BCSE, it issued its income withholding order to the Workers' Compensation Division on March 11, 1997, and sent a copy of the order to Mr. Stanley at the same time. On March 29, 1997, says the BCSE, it received the intercept of $32,796.60 from the Workers' Compensation Division and disbursed the money to Nada Stanley. This timetable indicates that Mr. Stanley had little time in which to raise the time limitation defense before the money was received by the BCSE and proffered to Ms. Stanley. Moreover, even if he had raised the defense prior to the actual withholding, as noted above, the withholding would not have been stayed pending the outcome of Mr. Stanley's challenge. Therefore, we do not believe that laches prevents Mr. Stanley's assertion of the statute of limitation defense.

■ Moreover, we do not believe that Rule of Civil Procedure 8 prevented consideration of Mr. Stanley's statute of limitation defense. Mr. Stanley's challenge to the income withholding was not a response to a pleading filed against him in circuit court, as contemplated by Rule 8. Rather, it was a response to an adverse administrative action. As noted above, the withholding occurred in March 1997, and Mr. Stanley apparently first raised the statute of limitation defense at a February 5, 1998, hearing. We conclude that Mr. Stanley's raising of the statute of limitation defense was not so untimely as to constitute a waiver.

■ Finally, the BCSE avers that Mr. Stanley's "unclean hands" based, *inter alia*, on his failure to pay past child support, including his failure to pay any portion of his $20,000 social security lump sum award, should prevent him from collecting any alleged overpayment from the BCSE. We find no merit in this argument. While this Court certainly does not condone Mr. Stanley's failure to meet his child support obligations, this failure did not prevent Nada Stanley and the BCSE from tolling the ten-year limitation period pursuant to W.Va.Code § 38-3-18. As a judgment debtor, Mr. Stanley enjoyed the same right as any other judgment debtor to avail himself of the statute of limitation defense. Accordingly, we reject the BCSE's challenges of the circuit court's application of the ten-year statute of limitation to Mr. Stanley's child support arrearages.

### B. Constitutional Immunity of the BCSE/DHHR

■ The BCSE next asserts that the circuit court erred in granting judgment against it because it is constitutionally immune from suit. According to the BCSE, it is a State instrumentality established within the West Virginia Department of Health and Human Resources ("DHHR"), and any money it is compelled to refund to Mr. Stanley would come directly from public funds. The BCSE further contends that the exception to constitutional immunity recognized by this Court in *Pittsburgh Elevator v. W.Va. Bd. of Regents*, 172 W.Va. 743, 310 S.E.2d 675 (1983), which permits suits against the State alleging recovery up to the limits of the State's liability insurance coverage, is not applicable because Mr. Stanley seeks to collect the repayment directly from public funds and has filed no pleading alleging recovery from the State's liability insurance carrier. Finally,

says the BCSE, recovery under the *Pittsburgh Elevator* exception is not applicable here because its action in withholding a portion of Mr. Stanley's Workers' Compensation award was not tortious.

■ We agree with the BCSE that it enjoys constitutional immunity from suit. According to Article VI, § 35 of the West Virginia Constitution, in part: "The State of West Virginia shall never be made defendant in any court of law or equity[.]" The DHHR is an agency of the State, *see* W.Va.Code § 9-2-1a (2003), and the BCSE is a unit of the DHHR.[13] *See* W.Va.Code § 48-18-101(a) (2002). This Court has held that "[t]he constitutional immunity of the state from suit extends to its governmental agencies." Syllabus Point 2, in part, *Stewart v. State Road Comm'n,* 117 W.Va. 352, 185 S.E. 567 (1936). "[T]he policy which underlies sovereign immunity is to prevent the diversion of State monies from legislatively appropriated purposes. Thus, where monetary relief is sought against the State treasury for which a proper legislative appropriation has not been made, sovereign immunity raises a bar to suit." *Mellon–Stuart Co. v. Hall,* 178 W.Va. 291, 296, 359 S.E.2d 124, 129 (1987) (citations and footnote omitted).

. We do not agree with the BCSE, however, that the *Pittsburgh Elevator* exception to constitutional immunity has no application to the facts of this case. This Court previously explained in *Parkulo v. West Virginia Bd. of Probation,* 199 W.Va. 161, 483 S.E.2d 507 (1996), that the State Board of Risk and Insurance Management is authorized, pursuant to W.Va.Code § 29-12-5(a) to purchase insurance providing coverage of all State "property, activities and responsibilities." In

Syllabus Point 2 of *Pittsburgh Elevator,* this Court held that "[s]uits which seek no recovery from state funds, but rather allege that recovery is sought under and up to the limits of the State's liability insurance coverage, fall outside the traditional constitutional bar to suits against the State." Subsequently, in Syllabus Point 1 of *Eggleston v. W.Va. Dept. of Highways,* 189 W.Va. 230, 429 S.E.2d 636 (1993), we held:

W.Va.Code, 29-12-5(a) (1986), provides an exception for the State's constitutional immunity found in Section 35 of Article VI of the West Virginia Constitution. It requires the State Board of Risk and Insurance Management to purchase or contract for insurance and requires that such insurance policy "shall provide that the insurer shall be barred and estopped from relying upon the constitutional immunity of the State of West Virginia against claims or suits.

■ We conclude that the Board of Risk and Insurance Management had a statutory duty to purchase or contract for insurance to provide coverage for all of the DHHR's activities and responsibilities.[14] Further, the DHHR has a responsibility to refund to an obligor money collected in excess of what is owed by the obligor. Due to Mr. Stanley's successful assertion of the statute of limitation on the execution of judgments, it has been determined that the DHHR collected from Mr. Stanley in excess of what he owed. Therefore, Mr. Stanley is entitled to a refund of his overpayment of child support arrearages under and up to the limits of the State's liability insurance coverage for loss on account of the DHHR's activities and responsibilities.[15]

13. Although Mr. Stanley stated in his brief to this Court that it is his understanding that the BCSE is operated by a private corporation, the BCSE responds that only its Kanawha County office is operated by a private company which is under contract to the State.

14. Due to the fact that the Board of Risk and Insurance Management had a statutory duty under W.Va.Code § 29-12-5(a), as stated in *Eggleston,* to purchase or contract for insurance for all of the DHHR's responsibilities, this Court wishes to make clear that the absence of any such coverage may not be used by the DHHR to deprive the appellee of a refund of his overpayment.

15. We emphasize that the issue of constitutional immunity arises only when, as here, the BCSE transfers the withheld funds to the obligee prior to the obligor's successful challenge of the withholding, and the BCSE is then unable to retrieve the improperly transferred funds from the obligee. When the BCSE is still in possession of the improperly withheld funds, it need only return the funds to the obligor. When the BCSE can retrieve the improperly withheld funds from the obligee, it should do so in order to return the funds to the obligor.

■ The BCSE asserts, however, that it is not liable to Mr. Stanley for the repayment of any funds because it is merely a collection agency acting as a conduit between the obligor and the obligee. Therefore, when it acts in good faith upon valid orders, it is not liable for repayment to an obligor when an overpayment results. Again, we disagree.

The Legislature has provided procedures to obligors whereby they can contest income withholding, *see* W.Va.Code § 48–14–405(8)—(11) (Supp.2001), and it also has directed in W.Va.Code § 48–14–407(b) (2002),[16] that "[t]he [West Virginia Support Enforcement] commission shall, by administrative rule, establish procedures for promptly refunding to obligors amounts which have been improperly withheld[.]" According to the Child Advocate Office Policy and Procedural Manual, Section 08010.20.20, effective November 1, 1993, which is incorporated by reference as a Legislative Rule,

In an income withholding case, if the overpayment to the caretaker resulted from a situation where the source of income withheld more than the allowable amount for the month or *for whatever reason* an amount was improperly withheld from the obligor's income, the [Child Advocate Office] must arrange to promptly refund the amount that was improperly withheld.

If too much money was paid to the caretaker as a result of such a situation, the overpayment must be recovered from the caretaker. (See 8010.20.05 and 8010.20.10). However, the [Child Advocate Office] will not wait for the caretaker to repay before paying the obligor, but will go ahead and refund the money to the obligor when the error is discovered. (Emphasis added.).

16. *See also* former W.Va.Code § 48A–5–3 (1995) which was in effect at the time of the income withholding in this case.

17. "OSCAR" is the highly complex Online Support Collection and Reporting system used by child support staff workers to create cases, locate absent parents, establish paternity and child support obligations, and collect and distribute payments. The system was implemented in May 1994 and federally certified in June 1996. OS-

It is clear from the above that the Legislature has manifested an intent that the BCSE repay funds which were improperly withheld from an obligor's income. It is equally clear that the BCSE has recognized that it has such a duty. Moreover, simple fairness dictates that when a government entity exercises its considerable power to obtain a portion of an obligor's income through force of law, it cannot escape all responsibility when its actions result in an overpayment by the obligor. Accordingly, we conclude that the BCSE is liable to an obligor for repayment when it improperly withholds funds from his or her income.

### C. The BCSE's Breach of Duty

■ Finally, the BCSE contends that the circuit court erred in its finding that the BCSE "breached its duty to pay the proceeds of the entire intercept to the proper persons." According to the BCSE, the notification of income withholding which it issued in March 1997 was in accord with the child support obligation ordered in the parties' divorce decree and the undisputed accounting of the BCSE. At that time, explains the BCSE, Mr. Stanley had not protested the withholding based on the statute of limitation, and he would not do so for another eleven months. Therefore, at the time of the withholding Nada Stanley was the only proper person to whom the sum of money was owed.

In its order, the circuit court found:

[T]he BCSE did not heed their OSCAR program[17] warning of possible laches and statute of limitation claim prior to sending the money to Nada Stanley, it merely disregarded the warnings, and apparently did not seek final disposition of the 1993 filings prior to distributing the workers compensation intercepted proceeds.

CAR enables caseworkers to intercept federal and state tax refunds, workers' compensation, and unemployment benefits; place liens on property; notify credit reporting agencies of delinquencies; and sue to recover assets that are transferred to another person to avoid paying child support. *See* https://www.nascio.org/awards/1998awards/Inter/westvirginia.cfm.

7. The BCSE became the bailee of all the intercepted funds and by their own policy manual directive ... had the responsibility to see to it that the funds were properly delivered to the persons entitled to such funds as their proper destination, and the BCSE (DHHR) breached its duty to pay the proceeds of the entire intercept to the proper persons.

8. The BCSE perceived an equitable argument regarding the statute of limitations, however, a reasonable person would have known under the circumstances of this case that the statute of limitations as well as other law would and does apply to bar the arrearage claims of the Plaintiff/Respondent for judgment over 10 years old, and uncollected arrearages over 10 years old. (Footnote added.).

 We do not believe that the circuit court erred in finding that the BCSE breached its duty to pay the proceeds to the proper persons. As noted by the circuit court, in 1993 Mr. Stanley filed a petition for a determination of arrears but no order was entered as a result of these proceedings. Despite unresolved questions concerning the amount of the arrearage, however, the BCSE transferred the entire amount of the Workers' Compensation intercept to Nada Stanley.[18] In addition, contained in the record is a copy of a 1995 "legal/policy update" memorandum sent to child advocate employees by the Assistant General Counsel of the Office of the Child Advocate [19] that informs employees that "there is a 10–year statute of limitations on enforcement of judgments. If the creditor ... doesn't enforce the judgment, or renew it by getting a new writ of execution every 10 years, it dies." Finally, the original divorce decree in this case was entered in 1978, and the intercept of Mr. Stanley's Workers' Compensation award occurred in 1997, almost twenty years later. Therefore, we conclude that BCSE employees were aware of the ten-year statute of limitation on the execution of judgments. Further, the passage of time between the entry of the original divorce decree and the income withholding at issue put the BCSE on notice of potential time limitations on the collection of the arrearage.[20] Finally, despite this notice, the BCSE breached its duty to make further inquiry, and simply transferred the withheld funds to Nada Stanley.

18. In its brief, the BCSE states that counsel for Nada Stanley, by letter, requested guidance from the Family Law Master regarding the failure of counsel for Mr. Stanley to endorse and return the proposed order from a December 8, 1994, hearing. According to the BCSE, the proposed order recommended a judgment of $61,322.94 against Mr. Stanley, but that the order remains outstanding. We note that W.Va.Code § 48A–4–13 (1993), in effect at the time, required the family law master to submit a recommended order to the circuit court within ten days following the close of evidence. In *State ex rel. Coats v. Means*, 188 W.Va. 233, 423 S.E.2d 636 (1992), this Court found that this duty is mandatory and nondiscretionary so that mandamus is a proper remedy to compel the entry of the recommended order. Therefore, Mr. Stanley did not single-handedly prevent the entry of the family law master's recommended order after the December 8, 1994, hearing on Nada Stanley's contempt petition and Mr. Stanley's petition for determination of arrearage.

19. The Child Advocate Office now refers to the BCSE. *See* W.Va.Code § 48–1–208 (2001) ("A reference in this chapter and elsewhere in this code to the 'child advocate office' or the child support enforcement division shall be interpreted to refer to the bureau for child support enforcement.").

20. Another issue raised by the BCSE is that the April 9, 1998, order improperly granted to Mr. Stanley retroactive credit for social security benefits received by his children as far back as February 1994. We are unable to find in the record, however, that the BCSE timely filed exceptions to the April 9, 1998, order. According to W.Va.Code § 48A–4–17 (1993), in effect at the time, "[f]ailure to timely file the petition shall constitute a waiver of exceptions, unless the petitioner, prior to the expiration of the ten-day period, moves for and is granted an extension of time from the circuit court." In Syllabus Point 1 of *Czaja v. Czaja*, 208 W.Va. 62, 537 S.E.2d 908 (2000), this Court held, in part, that "[f]ailure to comply with the ten-day period for filing exceptions to a recommended order of a family law master, barring a timely filing of and approval of one ten-day extension period, is fatal with regard to preserving those exceptions for appeal." *See also Delapp v. Delapp*, 213 W.Va. 757, 584 S.E.2d 899 (2003) (per curiam), (finding that *Czaja* does not prevent relief from failing to file exceptions within the ten-day period upon a showing of excusable neglect under Rule 60(b)(1) of the West Virginia Rules of Civil Procedure.). Because the BCSE failed to except to the granting to Mr. Stanley of retroactive credit for social security benefits received by his children, we decline to address this issue.

In sum, we find that the circuit court properly applied the ten-year limitation period for the execution of judgments. We also find that the DHHR, of which the BCSE is a part, is a State agency which enjoys constitutional immunity from suit. However, because the *Pittsburgh Elevator* exception to constitutional immunity applies, we find that Mr. Stanley can collect the amount he overpaid from the DHHR under and up to the limits of the State's liability coverage. Finally, we conclude that the DHHR breached its duty to pay the proceeds of the Workers' Compensation intercept to the proper persons.

## IV.

## CONCLUSION

For the reasons set forth above, the April 27, 2001, order of the circuit court is affirmed.

Affirmed.

Justice DAVIS concurs, in part, dissents, in part, and reserves the right to file a separate opinion.

DAVIS, J., dissenting in part:

(Filed Dec. 4, 2003)

The majority opinion has determined that the circuit court had jurisdiction to impose a monetary judgment against the Department of Health and Human Resources, Bureau for Child Support Enforcement (hereinafter referred to as "the DHHR"), even though the DHHR did not have liability insurance coverage for the claim and there was no express statutory waiver of its sovereign immunity by the legislature. As a result of the majority's

1. To be clear, I understand that the applicable statute and regulation requires DHHR to reimburse an obligor for child support monies that were improperly taken. However, neither the statute nor the rule expressly permit an obligor to file an action in circuit court to obtain a refund. Without such express authority or in the absence of liability insurance coverage, the doctrine of sovereign immunity prevents an obligor from maintaining an action in circuit court against DHHR to recover the money. As I discuss in the body of my dissent, the exclusive remedy for the obligor is to seek a refund in the Court of Claims.

ruling, every single activity engaged in and responsibility undertaken by state agencies must now have liability insurance coverage; and if such coverage does not exist, the agency can still be sued in circuit court and a recovery obtained. For the reasons set out below, I dissent.[1]

### A. The Majority Opinion Has Grossly Misinterpreted Eggleston

In this proceeding the DHHR asserted that it did not have insurance coverage for the judgment imposed against it by the circuit court. In a sweeping and unprecedented manner, the majority opinion holds "that the Board of Risk and Insurance Management had a statutory duty to purchase or contract for insurance to provide coverage for all of the DHHR's activities and responsibilities." The opinion states further in footnote 14 that "this Court wishes to make clear that the absence of any such coverage may not be used by the DHHR to deprive the appellee of a refund of his overpayment." This sweeping pronouncement by the majority opinion has opened the door for every claim against state agencies to be brought in the circuit courts of this state. That is, the majority opinion stands for the proposition that the Board of Risk and Insurance Management (hereinafter referred to as "BRIM") must provide liability insurance coverage for *every* activity and responsibility that state entities undertake. Further, to the extent that liability insurance coverage for an activity or responsibility of a state entity is not provided, a party may still litigate the case in circuit court and obtain a judgment. This is a profoundly misguided ruling unsupported by precedent or other authority.

The issue of a refund by DHHR is procedurally different from that of a taxpayer seeking a refund from the Tax Commissioner. The legislature has expressly provided for the issue of a tax refund to be litigated in circuit court, after administrative proceedings. *See* W. Va.Code § 11-10A-19 (2002) (Repl.Vol.2003). *See also Houyoux v. Paige*, 206 W.Va. 357, 524 S.E.2d 712 (1999) (claim for refund); *Doran & Assoc., Inc. v. Paige*, 195 W.Va. 115, 464 S.E.2d 757 (1995) (same). However, no such express statutory or regulatory authority exists for litigating a refund claim against DHHR in circuit court.

The majority opinion purports to rely upon *Eggleston v. West Virginia Dep't of Highways*, 189 W.Va. 230, 429 S.E.2d 636 (1993), for the proposition that BRIM must provide liability insurance for all activities and responsibilities of state entities. Specifically, the majority opinion relies on syllabus point 1 of *Eggleston*:

> W. Va.Code, 29–12–5(a) (1986), provides an exception for the State's constitutional immunity found in Section 35 of Article VI of the West Virginia Constitution. It requires the State Board of Risk and Insurance Management to purchase or contract for insurance and requires that such insurance policy "shall provide that the insurer shall be barred and estopped from relying upon the constitutional immunity of the State of West Virginia against claims or suits."

As will be shown, the majority opinion has taken syllabus point 1 of *Eggleston* out of context and literally pushed the state toward the doorsteps of bankruptcy.

In *Eggleston*, the plaintiff was involved in tractor-trailer accident on a highway and brought an action against the West Virginia Department of Highways. The plaintiff alleged that his accident was caused by DOH's negligence in designing, constructing, maintaining, and failing to properly warn of the unsafe nature of highway. The circuit court found that the insurance coverage provided to the DOH by BRIM did not cover the type of harm complained of by the plaintiff. Consequently, the circuit court granted summary judgment to DOH and dismissed the action. The plaintiff appealed.

Justice Miller began the opinion in *Eggleston* by stating that "[b]efore we address the issue of insurance policy coverage, it is useful to explain the underlying legal concept that enables the plaintiff to sue the WVDOH." *Eggleston*, 189 W.Va. at 232, 429 S.E.2d at 638. The opinion then went on to discuss the state's sovereign immunity and the exception to that immunity when liability insurance coverage is obtained. Regarding insurance coverage, *Eggleston* made the following general observation, which became syllabus point 1:

W. Va.Code, 29–12–5(a) (1986), provides an exception to the State's constitutional immunity found in Section 35 of Article VI of the West Virginia Constitution. It requires the State Board of Risk and Insurance Management to purchase or contract for insurance and requires that such insurance policy "shall provide that the insurer shall be barred and estopped from relying upon the constitutional immunity of the State of West Virginia against claims or suits."

*Eggleston*, 189 W.Va. at 232, 429 S.E.2d at 638. The latter quote from *Eggleston* was never intended to mean, or to be interpreted as holding, that BRIM had a statutory duty to provide liability insurance coverage for all activities and responsibilities of state agencies and that a failure to provide such coverage would not preclude an action in a state court against an agency.

If the majority's interpretation of syllabus point 1 of *Eggleston* is correct, then Justice Miller would not have concluded his preliminary remarks by observing that:

> In other jurisdictions which have a similar type of statutory insurance provision, courts have also reached the result that, *insofar as a plaintiff's damage claim is covered by the state's insurance policy* barring the assertion of the state's constitutional immunity, the suit may be maintained.
>
> *Our focus is, therefore, whether the insurance policy at issue provides coverage for the type of accident that occurred in this case.*

*Eggleston*, 189 W.Va. at 232–233, 429 S.E.2d at 638–639 (Footnotes omitted) (citations omitted) (emphasis added). If *Eggleston* stood for the proposition that the majority opinion has given it, there would have been no need for Justice Miller to determine whether the policy language covered the claim—the opinion would have concluded that the policy should have covered the claim because BRIM had a statutory duty to provide for all of DOH's activities and responsibilities. Morever, in reversing the circuit court's ruling, Justice Miller made clear that the "complaint and discovery material contains sufficient facts to come within the liabil-

ity insurance policy coverage purchased by the WVDOH, at least for purposes of a summary judgment motion." *Eggleston,* 189 W.Va. at 231, 429 S.E.2d at 637. Clearly, *Eggleston* did not expressly or implicitly hold that BRIM has a statutory duty to provide liability insurance coverage for all activities and responsibilities of state agencies; and that a failure to provide such coverage would not preclude an action in a state court against an agency. *See Shrader v. Holland,* 186 W.Va. 687, 689, 414 S.E.2d 448, 450 (1992) (emphasis added) ("The Board of Risk and Insurance Management for the State of West Virginia has purchased an insurance policy *that covers some claims* against the Department of Highways.").[2]

### B. BRIM Is Not Required by Statute to Provide Liability Insurance Coverage for Every State Activity and Responsibility

The authority for BRIM to provide insurance for state agencies is set out in W. Va.Code § 29–12–5. Under this statute, BRIM has "general supervision and control over the insurance of all state property, activities and responsibilities, including the acquisition and cancellation thereof; *determination of amount and kind of coverage ...* and any and all matters, factors and considerations entering into ... coverage of all such state property, activities and responsibilities." W.Va.Code § 29–12–5(a) (emphasis added). Clearly under the language of this statute the legislature has not made it mandatory that BRIM provide liability insurance coverage for every state activity and responsibility. BRIM has the authority to do this, but it is not required to do so. That is, the determination of the type of coverage, if any, that an agency obtains is a discretionary matter for BRIM.

Indeed, the West Virginia Attorney General issued an official opinion in 1963 that recognized BRIM's discretion in determining insurance coverage for state agencies. In that opinion the Attorney General wrote that BRIM has "the authority to determine whether or not a particular State governmental activity was sufficiently grave and its employees were undertaking the discharge of the kind of responsibilities that should be insured against claims of damage." 50 Op. W. Va. Att'y Gen. 230, 234 (Mar. 6, 1963).[3] *See also* CSR 115–2–7.1 (1990) ("The Board shall determine and establish rates, rate programs, deductibles, and coverages as needed.").

Under the majority opinion, BRIM does not have discretion to determine what type of coverage a state agency should have. The majority opinion has found that BRIM "must" obtained liability insurance coverage for all activities and responsibilities of all state agencies.

### C. Under the Majority Opinion No Claim Against a State Agency Need Ever Be Filed in the Court of Claims

Prior to the decision in the instant case, this Court had held that if a state agency did not have liability insurance coverage for an injury or harm allegedly committed by it, an action against the agency could not be maintained in the circuit courts of this state. *Cf.* Syl. pt. 2, *Pittsburgh Elevator v. West Virginia Bd. of Regents,* 172 W.Va. 743, 310 S.E.2d 675 (1983) ("Suits which seek no recovery from state funds, but rather allege that recovery is sought under and up to the limits of the State's liability insurance coverage, fall outside the traditional constitutional bar to suits against the State."). However, an injured party could maintain an action in the Court of Claims against the state agency.

---

**2.** Subsequent to the decision in *Eggleston* this Court specifically remanded several cases for a determination of whether a state agency had liability insurance coverage. *See Jeffrey v. West Virginia Dep't of Pub. Safety,* 198 W.Va. 609, 615, 482 S.E.2d 226, 232 (1996) ("If the State has not procured insurance indicating such coverage, the public duty doctrine serves as a bar to the Appellant's suit. If the State's insurance does provide coverage, the action may proceed, and liability will be limited only by the limits of insurance coverage."); *Parkulo v. West Virginia Bd. of Pro-*

*bation and Parole,* 199 W.Va. 161, 180, 483 S.E.2d 507, 526 (1996) ("There remains only the question of whether the actual provisions of such policy ... cover the operation of the Parole Board.... We remand to develop the record on the coverage issue[.]").

**3.** The language in W.Va.Code § 29–12–5(a) that was construed by the Attorney General in 1963 is the same language that exists in the statute today.

*See* Syl. pt. 3, *G.M. McCrossin, Inc. v. West Virginia Bd. of Regents*, 177 W.Va. 539, 355 S.E.2d 32 (1987) ("Application to the court of claims is the exclusive remedy available to a sophisticated commercial entity, chargeable with knowledge of the rule of sovereign immunity, which chooses, nevertheless, to contract with a state agency.").

This Court recently noted that "[t]he Legislature has established the Court of Claims by law and delegated to it the Legislature's power to investigate certain claims against the State that may not be prosecuted in the courts because of the State's sovereign immunity." *State ex rel. McLaughlin v. West Virginia Court of Claims*, 209 W.Va. 412, 415, 549 S.E.2d 286, 289 (2001) (per curiam) (footnotes omitted). *See also State ex rel. C & D Equip. Co. v. Gainer*, 154 W.Va. 83, 92, 174 S.E.2d 729, 734 (1970) ("Any monetary claims against an agency of the state which is immune from suit is within the jurisdiction of the Court of Claims.").[4] The Court of Claims "is authorized to consider and approve claims against the State not otherwise cognizable in the regular courts of the State, and to recommend an award to the Legislature." *Pittsburgh Elevator*, 172 W.Va. at 754 n. 7, 310 S.E.2d at 686 n. 7.[5]

Under the majority's decision, if a litigant has a claim against any state entity, and there is no liability insurance coverage for the claim, the litigant does not have to file an action in the Court of Claims. The majority opinion has determined that lack of liability insurance coverage is not a bar to litigating an action against a state agency in circuit court, because BRIM has a statutory duty to provide such coverage.

The majority's ruling completely fails to recognize the costs to taxpayers if BRIM has to maintain liability insurance coverage for

every activity and responsibility that the state undertakes. Moreover, the majority's ruling completely fails to understand the costs to taxpayers if BRIM does not maintain liability insurance coverage for every activity and responsibility that the state undertakes.

In view of the foregoing, I dissent.

---

4. Pursuant to W. Va.Code § 14-2-13 (1967) (Repl.Vol.2003) the jurisdiction of the Court of Claims extends to:

> 1. Claims and demands, liquidated and unliquidated, ex contractu and ex delicto, against the State or any of its agencies, which the State as a sovereign commonwealth should in equity and good conscience discharge and pay.
> 2. Claims and demands, liquidated and unliquidated, ex contractu and ex delicto, which may be asserted in the nature of setoff or counterclaim on the part of the State or any state agency.
> 3. The legal or equitable status, or both, of any claim referred to the court by the head of a state agency for an advisory determination.

5. Under W. Va.Code § 14-2-14(5) the Legislature has withheld from the Court of Claims the power to consider "any claim ... [w]ith respect to which a proceeding may be maintained against the State, by or on behalf of the claimant in the courts of the State."